















JPP    8/16/02    13:52

3:02-CV-01647    CELTERRA NORTH V. TROWBRIDGE

*1*

*NTCREM.*

FILED

02 AUG 15 PM 3:34

1  Linda Van Winkle Deacon (State Bar No. 60133)
   Susan C. V. Jones (State Bar No. 149446)
2  BATE, PETERSON, DEACON, ZINN & YOUNG, LLP
   888 South Figueroa Street
3  15th Floor
   Los Angeles, California 90017
4  Telephone:   (213) 362-1860
   Facsimile:    (213) 362-1861
5
   Attorneys for Defendant
6  J. BENJAMIN TROWBRIDGE
7
8                    UNITED STATES DISTRICT COURT
9                 SOUTHERN DISTRICT OF CALIFORNIA
10
11                                          '02 CV 1647 K (AJB)
   CELTERRA NORTH AMERICA, INC., a )      Case No. _____
12 Delaware Corporation,            )
                                    )      NOTICE OF REMOVAL OF CIVIL
13              Plaintiff,          )      ACTION TO THE UNITED STATES
                                    )      DISTRICT COURT UNDER 28 U.S.C. §§
14         v.                       )      1332(a) AND 1441(a) and (b)
                                    )      (DIVERSITY); DECLARATIONS OF J.
15 J. BENJAMIN TROWBRIDGE, an       )      BENJAMIN TROWBRIDGE AND SUSAN
   individual; and DOES 1 through 10, )    C. V. JONES AND EXHIBITS IN
16                                  )      SUPPORT THEREOF   VIA FAX
                                    )
17              Defendants.         )      (San Diego Superior Court Case No.
   _____ )      GIC789895)
18
19
20
21
22
23        TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
24 CALIFORNIA. PLAINTIFF CELTERRA NORTH AMERICA, INC., AND TO ITS
25 ATTORNEYS OF RECORD:
26
27                                          1
28

ORIGINAL

1      PLEASE TAKE NOTICE THAT Defendant J. Benjamin Trowbridge ("Trowbridge" or

2   "Defendant") hereby removes the above-entitled action from the Superior Court of the State of

3   California for the County of San Diego to the United States District Court for the Southern

4   District of California, based on diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332(a) and (b).

5   The facts that entitle Defendant to so remove this action are as follows:

6

7      1.      On or about June 14, 2002, plaintiff Celterra North America, Inc. ("Celterra" or

8   "Plaintiff") filed a First Amended Complaint in the Superior Court of the State of California for

9   the County of San Diego entitled: CELTERRA NORTH AMERICA, INC., a Delaware

10  Corporation, Plaintiff, v. J. BENJAMIN TROWBRIDGE, an individual; and DOES 1 through

11  10, Defendants, which was designated as Case No. GIC 789895.   The First Amended Complaint

12  alleges the following two purported causes of action: (1) Breach of Contract (Employment

13  Agreement); and (2) Breach of Promissory Note.  [A copy of the First Amended Complaint,

14  Exhibits thereto, and related notices, is attached as Exhibit "A" to the Declaration of J. Benjamin

15  Trowbridge, attached hereto ("Trowbridge Decl.").]

16

17     2.      On July 17, 2002, Plaintiff caused a copy of the First Amended Complaint, along

18  with a Notice of Case Assignment and Notice to Litigants from the San Diego County Superior

19  Court, to be left in Trowbridge's mailbox.   [Trowbridge Decl., ¶ 2.]

20

21     3.      No other initial pleadings were received by Trowbridge prior to his receipt of the

22  First Amended Complaint on July 17, 2002. [Trowbridge Decl., ¶ 2.]  Trowbridge never

23  received a copy of the initial complaint (presumably filed prior to the First Amended Complaint),

24  and never received a summons. [Id.]  Accordingly, this Notice of Removal is being filed within

25  30 days of Trowbridge's first date of receipt of the initial pleading, and is therefore timely filed

26  pursuant to 28 U.S.C. § 1446(b).  Notice of this removal will be given both to the adverse party

27

28

2

NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT
UNDER 28 U.S.C. §§ 1332(a) AND 1441(a) and (b) (DIVERSITY);
DECLARATIONS AND EXHIBITS IN SUPPORT THEREOF

1 and to the state court pursuant to 28 U.S.C. § 1446(d).  The First Amended Complaint and the

2 aforementioned notices encompass all process, pleadings and orders served on Defendant or by

3 Defendant in this action.

4

5     4.    The First Amended Complaint and each alleged cause of action contained therein

6 properly may be removed on the basis of diversity of citizenship jurisdiction, in that it is a civil

7 action between citizens of different states and the matter in controversy exceeds the sum of

8 $75,000 exclusive of interests and costs.  28 U.S.C. §§ 1332 and 1441.

9

10     a.    Plaintiff is, and was at the time this action commenced, a citizen of the

11 State of California within the meaning of 28 U.S.C. § 1332(a).  [Trowbridge Decl., ¶ 4.]  As

12 Plaintiff's First Amended Complaint alleges, Celterra is "a Delaware company . . . with its

13 principal place of business in the County of San Diego in the State of California."  [First

14 Amended Complaint, ¶ 1.]

15

16     b.    Trowbridge is now, and at the time this action was commenced was, a

17 citizen of the State of Florida.  [Trowbridge Decl., ¶ 3.]  As the First Amended Complaint

18 alleges, Trowbridge "is an individual residing in the City of Miami, State of Florida."  [First

19 Amended Complaint, ¶ 2.]  Trowbridge is the only named defendant in this action.

20

21     c.    The presence of Doe Defendants in this case has no bearing on diversity

22 with respect to removal.  See 28 U.S.C. § 1441(a) ("For the purposes of removal under this

23 chapter, the citizenship of defendants sued under fictitious names shall be disregarded.").

24

25     d.    Plaintiff's First Amended Complaint seeks damages in the amount of

26 $450,000, exclusive of costs and interest.  [First Amended Complaint, ¶¶ 17 and 25.]

27

                                             3

28

1       5.    Because Plaintiff and Defendant are citizens of different states, and because the

2   Court may disregard the citizenship of Doe Defendants, there is complete diversity between the

3   parties.  Furthermore, since there is complete diversity and since the amount in controversy

4   threshold is met, the requirements for removal under 28 U.S.C. §§ 1331(a) and 1441(a) are

5   satisfied.

6

7       6.    Therefore, the Court has original jurisdiction of the First Amended Complaint,

8   pursuant to 28 U.S.C. § 1332.  The First Amended Complaint may therefore be removed to this

9   Court pursuant to the provisions of 28 U.S.C. § 1441.

10

11       WHEREFORE, Defendant removes this action to this Court.

12

13   DATED: August 14, 2002        BATE, PETERSON, DEACON, ZINN & YOUNG LLP

14

15       By: _____

16           Susan C. V. Jones
        Attorneys for Defendant J. BENJAMIN

17           TROWBRIDGE

18

19

20

21

22

23

24

25

26

27           4

28

NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT
UNDER 28 U.S.C. §§ 1332(a) AND 1441(a) and (b) (DIVERSITY);
DECLARATIONS AND EXHIBITS IN SUPPORT THEREOF

## DECLARATION OF J. BENJAMIN TROWBRIDGE

1

2

3      I, J. BENJAMIN TROWBRIDGE, declare:

4

5      1.      I am the sole named defendant in the instant case. I have personal knowledge of

6  the facts set forth in this Declaration, and if called to testify under oath, I could and would testify

7  competently thereto.

8

9      2.      A true and correct copy of plaintiff Celterra North America, Inc.'s ("Plaintiff" or

10  "Celterra") First Amended Complaint and accompanying notices, in the form received by me on

11  July 17, 2002, is attached hereto as Exhibit "A." This copy was left in my mailbox by someone

12  on the evening of July 17, 2002. It is the initial and only pleading I have received in this case

13  through service or otherwise. I never received a copy of, or was even aware of, Celterra's initial

14  complaint in this action. I do not recall receiving a Summons with the First Amended

15  Complaint. No other attempt has ever been made in this action to serve me with a summons or

16  complaint.

17

18      3.      I presently reside, as I did at the time this action was commenced, in Miami,

19  Florida. I am and have been a citizen of the State of Florida since approximately January, 2000.

20  Celterra alleges that I reside in Miami, Florida in its First Amended Compliant, and this

21  allegation is true and correct.

22  ///

23  ///

24  ///

25  ///

26  ///

27

28

Aug 14 20 04:40p   ben trowbridge          305 532 6764          p.2

08/14/2002  09:32   213362186          BPDZY LLP                    PAGE  03

4.      I am informed and believe that Celterra is a corporation incorporated under the
laws of the State of Delaware, with its principal place of business in San Diego, California.  This
is what Celterra alleges in its First Amended Complaint, and it is accurate to the best of my
knowledge.

I declare under penalty of perjury under the laws of the State of California and the laws of
the United States of America that the foregoing is true and correct, and that this Declaration was
executed this _13_ day of August, 2002, at __Villanova, PA__

_____
J. Benjamin Trowbridge

6

## DECLARATION OF SUSAN C. V. JONES

1.    I am an attorney at law, duly licensed to practice in the courts of the State of California, and admitted to the bar of this Court. I am associated with the law firm of Bate, Peterson, Deacon, Zinn & Young LLP, counsel to Defendant J. Benjamin Trowbridge. I have personal knowledge of the facts set forth in this Declaration, and if called to testify under oath, could and would testify competently thereto.

2.    Attached hereto as Exhibits "B" and "C" are true and correct copies of the Notice of Removal of this Action, which I gave to the Plaintiff and to the Superior Court for the County of San Diego in this action.

I declare under penalty of perjury under the laws of the State of California and the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of August, 2002 at Los Angeles, California.

Susan C. V. Jones

7

Keith A. Fink, Bar No. 146841
Stacy A. Coleman, Bar No. 217240
KEITH A. FINK & ASSOCIATES
11500 Olympic Blvd., Suite 316
Los Angeles, CA 90064
Telephone: (310) 268-0780
Facsimile: (310) 268-0790

Attorneys for Plaintiffs
Celterra North America, Inc.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| CELTERRA NORTH AMERICA, INC. a Delaware Corporation <br><br> Plaintiff, <br><br> v. <br><br> J. BENJAMIN TROWBRIDGE, an individual; and DOES 1 through 10, <br><br> Defendants. | CASE NO. GIC789895 <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> 1.  **BREACH OF CONTRACT** (Employment Agreement) <br> 2.  **BREACH OF PROMISSORY NOTE** <br><br> (Jury Trial Demanded) |

PLAINTIFF CELTERRA NORTH AMERICA, INC. hereby amends its original complaint in the above entitled action pursuant to *California Code of Civil Procedure* § 472 wherein any "pleading may be amended once by the party of course...at any time before the answer or demurrer is filed." No answer or demurrer has been filed in this matter. Plaintiff hereby alleges as follows::

### VENUE AND PARTIES

1.     Plaintiff Celterra North America, Inc. (hereinafter "CNA" or "Plaintiff") is, and at all times material hereto, was a Delaware company doing business as Celterra North America, Inc with its principal place of business in the County of San Diego, in the State of California.   CNA is a privately held corporation which is engaged in the research, design and development of optical network communications based on a revolutionary new technology owned by CNA, its parents, affiliates and subsidiaries

1   (collectively, hereinafter the "Company").

2       2.      CNA is informed and believes and thereupon alleges that Defendant J. Benjamin

3   Trowbridge (hereinafter "Trowbridge") is an individual residing in the City of Miami, State of Florida.

4       3.      Plaintiff is unaware of the true names and capacities, whether individual, corporate,

5   associate or otherwise, of Defendant DOES 1 to 10 (hereinafter "Defendants"), inclusive, and therefore

6   sues said Defendants by such fictitious names. Plaintiff will seek leave of Court to amend this Complaint

7   to show the true names and capacities of such Defendants when the same have been ascertained. Plaintiff

8   is informed and believes and thereupon alleges that each of the fictitiously named Defendants is

9   responsible to Plaintiff for the injuries suffered and alleged herein, is now, and was at all times mentioned

10  herein, the agent, principal, partner, joint venturer, employee or alter ego of the remaining Defendants, and

11  that all of the acts and conduct alleged herein were performed within the course and scope and in the

12  furtherance of such agency, partnership, joint venture, employment or alter ego relationship, or is subject

13  to the jurisdiction of the Court as a necessary party for the relief herein requested.

14      4.      Venue is properly laid in this Court as the alleged contracts upon which this action is based

15  took place in the County of San Diego. Venue is also properly laid in this Court because CNA's principal

16  place of business is in the City of Carlsbad, County of San Diego.  Venue is also properly laid in this

17  Court because the tortious acts complained of herein took place in the City of Carlsbad, County of San

18  Diego.

19

20                              **GENERAL ALLEGATIONS**

21      5.      In mid 2000, Trowbridge was retained by CNA as its Chief Executive Officer, charged with

22  using his best efforts to manage and direct CNA.  Subsequently, CNA and Trowbridge entered into a

23  written employment agreement with a four year term effective from the commencement of the employment

24  agreement or August 2, 2000 (attached hereto is a true and correct copy of such employment agreement

25  as exhibit "A" and hereinafter referred to as the "Employment Agreement").

26      6.      In addition to a compensation schedule laid out in the Employment Agreement and as

27  incentive for accepting a position with CNA, Trowbridge was offered a yearly salary as well as an option

28  to purchase two million four hundred thousand (2,400,000) shares of CNA's Class B non-voting common

FROM MORGAN LEWIS PHILADELPHIA NEC-9-5        (WED) 7. 24' 02 15:10 'ST. 15:15/NO. 4860405759 P  6

1  stock at an exercise price of .50 per share.  Trowbridge was also offered options to purchase one million

2  (1,000,000) shares of Omnigon International Holdings, Ltd (hereinafter "Omnigon") at an exercise price

3  of $.60 per share (collectively all the equity offered to Trowbridge is hereinafter referred to as "Company

4  Stock").  Omnigon was the parent company of CNA.  The Company Stock offered to Trowbridge was not

5  exercisable until Trowbridge had been an employee with CNA for a term not less than a year.  The actual

6  date the Company Stock would begin to vest, if at all, was August 2, 2001.

7       7.      In addition to Trowbridge's salary and stock, Trowbridge was given a loan in the amount

8  of four hundred and fifty thousand dollars ($450,000.00) at an interest rate of seven percent (7 %) per

9  annum (hereinafter the "Loan").  In exchange for the Loan, Trowbridge granted CNA a promissory note

10  dated August 4, 2000, secured by the Company Stock (attached hereto is a true and correct copy of such

11  employment agreement as exhibit "B" and hereinafter referred to as the "Note").

12       8.      The Loan was due and payable in full in one installment of principal and accrued interest

13  on the earlier of (a) eighteen months from the date of the making of the loan, (b) the effective date of

14  termination of Trowbridge for cause, or (c) the effective date of his voluntary resignation.  However, if

15  Trowbridge remained an employee of CNA for a period of not less than eighteen months, then the Loan

16  would be forgiven and the Note cancelled in its entirety.

17       9.      On February 14, 2001, approximately seven months after Trowbridge was hired by CNA,

18  Trowbridge voluntarily resigned from CNA.  CNA has paid in full Trowbridge's salary up and until

19  February 14, 2001.

20       10.      Although Trowbridge was required to repay the Loan if he ever resigned, to date, he has

21  not repaid any of the principal or interest, all of which is currently due and owing pursuant to his

22  Employment Agreement and the Note.

23                          **FIRST CAUSE OF ACTION**

24              (For Breach of Contract Against Benjamin Trowbridge)

25       11.      CNA refers to paragraphs 1 through 10 above, and by this reference incorporates such

26  paragraphs as though fully set forth herein.

27       12.      On August 2, 2000, CNA and Trowbridge entered into the Employment Agreement wherein

28  Trowbridge would provide services as an executive for CNA for a period of four years and CNA would

3

8·d               30SE5739876          uеБлоⵑ эихеm                    10

1  compensate Trowbridge according to the terms laid out in the agreement.

2       13.    Under the Employment Agreement, Trowbridge was loaned $450,000 at 7% per annum (the

3  "Loan"). In exchange for the Loan, Trowbridge promised CNA to repay the Loan in one installment of

4  principal and accrued interest on the earlier of 18 months from the making of the loan, termination

5  Trowbridge for cause, or his resignation.  Trowbridge further promised that if he failed to repay the Loan

6  under these circumstances that CNA would become the owners of the Company Stock he received by

7  virtue of the Employment Agreement.  The Company Stock could not vest until Trowbridge had been

8  employed by CNA for at least one year.

9       14.    On February 14, 2001, Trowbridge resigned his position with CNA, less than a year from

10  the date he started.

11       15.    CNA is informed and believes and thereupon alleges that Trowbridge breached his promise

12  under the Employment Agreement to repay the Loan accordingly by resigning his position prior to

13  eighteen months and failing to repay the principal and interest of the Loan in one lump sum.

14       16.    CNA has at all times hereto fully performed the terms and conditions of the Employment

15  Agreement for services, except where said performance was excused or prevented by the conduct of

16  Trowbridge.

17       17.    CNA is informed and believes and thereupon alleges that its damages are certain,

18  foreseeable and measurable consequences of the Trowbridge's breach because Trowbridge was given a

19  loan of $450,000.00 at 7% per annum, he resigned his position prior to eighteen months passing and has

20  not repaid the principal or interest on the Loan.  Furthermore, as a consequence of Trowbridge's untimely

21  resignation, the Company Stock did not vest, leaving CNA with an unsecured promise by Trowbridge to

22  repay.  As a result, CNA was not able to take the Company Stock in lieu of the $450,000.00.  Accordingly,

23  CNA is entitled to damages in the amount of $450,000.00 plus interest at 7% per annum from, at least,

24  August 2, 2000.

25                           **SECOND CAUSE OF ACTION**

26                           (For Breach of Promissory Note)

27       18.    CNA refers to paragraphs 1 through 17 above, and by this reference incorporates such

28  paragraphs as though fully set forth herein.

4

19.     As part of his Employment Agreement, Trowbridge was granted the Loan. In exchange for the Loan, Trowbridge assigned a promissory note to CNA which was secured by the Company Stock. The Loan would become due and payable in one lump sum of principal and interest immediately if Trowbridge was terminated for cause or voluntarily resigned. The loan would be forgiven if Trowbridge remained in CNA's employ for at least eighteen months.

20.     CNA has at all times hereto fully performed the terms and conditions of its promissory note, except where said performance was excused or prevented by the conduct of Trowbridge.

21.     Trowbridge voluntarily resigned on February 14, 2001, approximately seven months after his effective hiring date.

22.     As a result of Trowbridge's voluntary resignation, the total principal and interest on the $450,000.00 loan is now due and owing and the Company Stock has never vested.

23.     To date, Trowbridge has not repaid the Loan or any portion thereof to CNA.

24.     CNA is informed and believes and thereupon alleges that Trowbridge has breached his promise under the Note because the Loan became due immediately upon Trowbridge's resignation, however Trowbridge has not repaid the Loan or any part thereof.

25.     CNA's damages are certain, foreseeable and measurable consequences of Trowbridge's breach because CNA has not been repaid the $450,000.00 loan pursuant to the promissory note. Furthermore, since the Company Stock granted to Trowbridge which secured the promissory note never vested, CNA has nothing to foreclose upon in lieu of the $450,000.00.  Accordingly, CNA is entitled to damages in the amount of $450,000.00 plus 7% per annum interest.

WHEREFORE, CNA prays for judgment in its favor and against Trowbridge

1.      For the First and Second Cause of Action damages, according to proof in the approximate amount of, at least  $450,000.00 plus 7% interest per annum calculated over a two year period.

2.      For prejudgment interest at the legal rate;

5.      For CNA's fees and costs of suit and attorneys fees; and

6.      For such other and further relief as the Court may deem just and proper.

08/15/02    14:33    ACE MESS. ATT.SVC. → 619 232 6339    NO.074    D16

FROM MORGAN LEWIS PHILADELPHIA NEC-9-5    (WED) 7. 24' 02 15:2) /ST. 15:15 /NO. 2860403759

1  //

2  //

3  //

4  DATED: June 14, 2002

KEITH A. FINK & ASSOCIATES

By _____
Keith A. Fink
Stacy A. Coleman
Attorneys for Plaintiffs
Celterra North America, Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint.004.wpd                    Plaintiff's Complaint

P.11         3D5257538878

**EXHIBIT A**

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "Agreement") effective as of August 2, 2000 (the "Effective Date"), by and between Celterra North America, Inc., a Delaware corporation ("CNA" or the "Company"), and J. Benjamin Trowbridge, an individual (the "Executive"), with reference to the following facts:

A.      The Company is engaged in the optical network communications business;

B.      Company desires to retain the services of Executive, and Executive is willing to provide such services to the Company;

C.      The Company and Executive desire to enter into this Agreement to provide for Executive's employment by the Company upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing facts and mutual agreements set forth below, the parties, intending to be legally bound, agree as follows:

1.      Employment. The Company hereby agrees to employ Executive, and Executive hereby accepts such employment and agrees to perform Executive's duties and responsibilities in accordance with the terms and conditions hereinafter set forth.

1.1     Employment Term. The term of Executive's employment under this Agreement shall commence as of the date hereof (the "Effective Date") and shall continue for four (4) years, unless earlier terminated in accordance with Section 5 hereof. The period commencing as of the Effective Date and ending four (4) years thereafter or such later date to which the term of Executive's employment under the Agreement shall have been extended by written mutual agreement is hereinafter referred to as the "Employment Term."

1.2     Duties and Responsibilities. During the Employment Term, Executive shall serve as the Company's Chief Executive Officer, perform all duties and accept all responsibilities incident to such position or other appropriate duties as may be assigned to Executive by the Company's Board of Directors (the "Board") from time to time. Executive shall devote his full productive time and best efforts to the performing of his duties and responsibilities under this Section 1.2. All junior executive officers and employees of the Company shall report to the Executive.

1.3     Base Salary. During the Employment Term, the Company shall pay Executive a base salary (the "Base Salary") of Three Hundred Thousand Dollars ($300,000) per annum (payable in accordance with the Company's then-applicable payroll policies) as compensation for all services rendered by Executive hereunder. The Base Salary shall be subject to all state, federal, and local payroll tax withholding and any other withholdings required by law. Following each year after the Effective Date, Executive shall be reviewed by the

::ODMA\PCDOCS\SDL1861\2\053915

15

Company's Board to determine whether a raise in the Base Salary and other compensation and benefits is appropriate, in the sole and absolute discretion of the Board.

1.4     Benefit Coverages.  During the Employment Term, Executive shall be entitled to participate in all employee pension and welfare benefit plans and programs made available to the Company's senior level executives as a group or to its employees generally, as such plans or programs may be in effect from time to time (the "Benefit Coverages"), including, without limitation, pension, profit sharing, savings and other retirement plans or programs, medical, dental, hospitalization, short-term and long-term disability and life insurance plans, accidental death and dismemberment protection and travel accident insurance.

1.5     Performance Bonuses.  Within ninety (90) days after the end of each fiscal year of the Company, which is currently December 31ˢᵗ, during the Employment Term, the Executive will be eligible to receive a bonus (the "Performance Bonus") in an amount as determined at the discretion of the Board of the Company; provided that Executive shall receive a minimum bonus of One Hundred Ten Thousand Dollars ($110,000) over two (2) years of the Employment Term (or aggregate of Two Hundred Twenty Thousand Dollars ($220,000)), payable as follows: Thirty Six Thousand Three Hundred Dollars ($36,300) within sixty (60) days after December 31, 2000; (ii) One Hundred Ten Thousand Dollars ($110,000) within sixty (60) days after December 31, 2001; and (iii) Seventy Three Thousand Seven Hundred Dollars ($73,700) within sixty (60) days after December 31, 2002; provided, however, upon the closing of an equity financing of the Company in the minimum amount of Seventy Five Million Dollars ($75,000) (the "Financing") Executive shall receive an aggregate amount of One Hundred Ten Thousand Dollars ($110,000), including any prior sums paid through such Financing date and if the Financing is before February 28, 2002, the second $110,000 bonus shall instead be due in one installment within sixty (60) days after December 31, 2002.  Any minimum bonus shall be credited against any other Performance Bonus otherwise earned by Executive under the Company's then-effective bonus programs.  To the extent that, for any given year of the Employment Term, Executive has been employed for less than the full year, the Performance Bonus shall be reduced on a pro rata basis for the amount of time actually worked during such year.  All bonus payments shall be subject to customary withholdings required by law.

1.6     CNA Stock Options.  The Company hereby grants to the Executive an option to purchase two million four hundred thousand (2,400,000) shares (the "CNA Option Shares") of the Company's Class B non-voting common stock pursuant to its 2000 Equity Incentive Plan (the "Plan") at an exercise price of $0.50 per share, which shall vest over four (4) years and shall be granted pursuant to the form Stock Option Agreement attached hereto as Exhibit "A" and incorporated herein by this reference.  The CNA Option Shares equal approximately four and a half percent (4 ½%) of the initial outstanding shares of capital stock of the Company.  The CNA Option Shares will be exercisable for a term of ten (10) years, pursuant to the Stock Option Agreement.

1.7     Omnigon International Holdings Ltd. Options.  Omnigon International Holdings Ltd., a British Virgin Island, shall grant to the Executive an option to purchase one million (1,000,000) shares of the Company's common stock ("Omnigon International Option

Shares") pursuant to its 2000 Equity Incentive Plan (the "Omnigon International Plan") at an exercise price of Sixty Cents ($0.60) per share, which shall vest over four (4) years and shall be granted pursuant to the form Stock Option Agreement attached hereto as Exhibit "B" and incorporated herein by this reference. The Omnigon International Option Shares equal approximately one point nine percent (1.9%) of the current outstanding shares of capital stock of Omnigon International Holdings Ltd. The Omnigon International Option Shares shall be exercisable for a term of ten (10) years pursuant to the Stock Option Agreement.

     1.8    **Expenses.** During the Employment Term, Executive shall be reimbursed for all reasonable business expenses incurred and paid by Executive in providing services on behalf of the Company, including, but not limited to, expenses covered by a budget approved by the Board of the Company. Any actual or anticipated expenses over Five Hundred Dollars (US) ($500(US)) not covered by an approved budget must be approved in such manner as is acceptable to the Board prior to incurring such expense. An expense report detailing such expenses with such supporting documentation as the Company may reasonably require (the "Expense Report") must be submitted to the Company prior to the Company's reimbursement of such expense.

     1.9    **Vacations and Holidays.** Each year, the Executive shall be entitled to an aggregate of three (3) weeks' paid vacation plus holidays in accordance with the Company's policies, as amended from time to time, for senior executive officers.

     1.10    **Moving Allowance.** Upon presentation of proper documentation, Executive shall be reimbursed for the reasonable expenses of moving (including, but not limited to, moving his boat) from Miami, Florida to County of San Diego, California, in an amount not to exceed Twenty Five Thousand Dollars ($25,000).

     1.11    **Loan.** Concurrent with the execution of this Agreement, the Company or its affiliate shall make a loan to Executive in the principal amount of Four Hundred Fifty Thousand Dollars ($450,000) (the "Loan"), which Loan shall bear interest at seven percent (7%) per annum and shall be due and payable in full in one installment of principal and accrued interest on the earlier of eighteen (18) months of making such Loan or termination of Executive for cause hereunder or voluntary resignation. If Executive remains employed by the Company (or an affiliate by mutual agreement) at the end of eighteen (18) months, the Loan shall be forgiven in its entirety. The Loan shall be secured by Executive's CNA Option Shares and Omnigon International Option Shares and any shares issued upon exercise thereof. The Loan shall be made pursuant to a form of promissory note containing the foregoing terms executed and delivered by Executive to the Company.

    2.    Confidential Information.

     2.1    Executive recognizes and acknowledges that by reason of Executive's employment by and service to the Company before, during and, if applicable, after the Employment Term, Executive will have access to certain confidential and proprietary information relating to the Company's business, which may include, but is not limited to, trade

secrets, trade "know-how," product development techniques and plans, formulas, customer lists and addresses, cost and pricing information, marketing and sales techniques, strategy and programs, computer programs and software and financial information (collectively referred to as "Confidential Information"); provided, however, any of the foregoing that is in the public domain shall not be deemed Confidential Information. Executive acknowledges that such Confidential Information is a valuable and unique asset of the Company and Executive covenants that he will not, unless expressly authorized in writing by the Company, at any time during the course of Executive's employment use any Confidential Information or divulge or disclose any Confidential Information to any person, firm or corporation except in connection with the performance of Executive's duties for the Company and in a manner consistent with the Company's policies regarding Confidential Information. Executive also covenants that at any time after the termination of such employment, directly or indirectly, he will not use any Confidential Information or divulge or disclose any Confidential Information to any person, firm or corporation, unless such information is in the public domain through no fault of Executive or except when required to do so by a court of law, by any governmental agency having supervisory authority over the business of the Company or by any administrative or legislative body (including a committee thereof) with apparent jurisdiction to order Executive to divulge, disclose or make accessible such information. All written Confidential Information (including, without limitation, in any computer or other electronic format) which comes into Executive's possession during the course of Executive's employment shall remain the property of the Company. Except as required in the performance of Executive's duties for the Company, or unless expressly authorized in writing by the Company or required by governmental authority, Executive shall not remove any written Confidential Information from the Company's premises, except in connection with the performance of Executive's duties for the Company and in a manner consistent with the Company's policies regarding Confidential Information. Upon termination of Executive's employment, the Executive agrees to return immediately to the Company all written Confidential Information (including, without limitation, in any computer or other electronic format) in Executive's possession.

        2.2     As a material inducement to the Company entering into this letter agreement, Executive further agrees to execute the Company's standard employee Confidentiality and Inventions Agreement, attached hereto as Exhibit "C" and incorporated herein by this reference, relating to confidential information and the assignment of proprietary developments to the Company.

3.     **Non-Competition; Non-Solicitation.**

        3.1     During Executive's employment with the Company, Executive will not, except with the prior written consent of the Board, directly or indirectly, anywhere in the United States, own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or be connected as an officer, director, employee, partner, principal, agent, representative, consultant or otherwise with, or use or permit Executive's name to be used in connection with, any business or enterprise (a "Competitor") which competes with the Company or generates, directly or indirectly, for itself or others revenues from the type of

product and services provided by the Company or its affiliates during Executive's employment by the Company.

3.2    The foregoing restrictions shall not be construed to prohibit the ownership by Executive of less than one percent (1%) of any class of securities of any corporation which is a Competitor having a class of securities registered pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act"), provided that such ownership represents a passive investment and that neither Executive nor any group of persons, including Executive in any way, either directly or indirectly, manages or exercises control of any such corporation, guarantees any of its financial obligations, otherwise takes any part in its business, other than exercising Executive's rights as a shareholder, or seeks to do any of the foregoing.

3.3    Executive further covenants and agrees that during Executive's employment by the Company and for the period of five (5) years thereafter, Executive will not, directly or indirectly, (i) solicit, divert, take away, or attempt to solicit, divert or take away, any of the Company's customers, or (ii) encourage any customer to reduce its patronage of the Company.

3.4    Without limiting the generality of the foregoing, Executive agrees that during Executive's employment by the Company and for the period of five (5) years thereafter, he will not, directly or indirectly, solicit any customer to retain from any other person, firm or entity any services of a type generally similar to or competitive with the Company's product and/or services during the period of Executive's employment by the Company.

3.5    Executive further covenants and agrees that during Executive's employment by the Company and for the period of five (5) years thereafter, Executive will not, directly or indirectly, solicit or hire, or encourage the solicitation or hiring of any person who was an employee of the Company at any time during the term of Executive's employment by the Company by any employer other than the Company for any position as an employee, independent contractor, consultant or otherwise. The foregoing sentence shall not apply to any person after a period of twelve (12) months has elapsed subsequent to the date on which such person's employment by the Company has terminated.

4.    Equitable Relief.

4.1    Executive acknowledges and agrees that the restrictions contained in Sections 2 and 3 are reasonable and necessary to protect and preserve the legitimate interests, properties, goodwill and business of the Company and its affiliates, that the Company would not have entered into this Agreement in the absence of such restrictions and that irreparable injury will be suffered by the Company should Executive breach any of the provisions of those Sections. Executive represents and acknowledges that (i) he has been advised by the Company to consult Executive's own legal counsel in respect to this Agreement and (ii) that he has had full opportunity, prior to execution of this Agreement, to review this Agreement thoroughly with Executive's counsel.

Aug 09 20 08:35p          ber trowbridge              305 732 6764          p.3

4.2      Executive further acknowledges and agrees that a breach of any of the
restrictions in Sections 2 and 3 cannot be adequately compensated by monetary damages.
Executive agrees that the Company shall be entitled to preliminary and permanent injunctive
relief, without the necessity of proving actual damages, as well as an equitable accounting of all
earnings, profits and other benefits arising from any violation of Sections 2 or 3 hereof, which
rights shall be cumulative and in addition to any other rights or remedies to which the Company
may be entitled.  In the event that any of the provisions of Sections 2 and 3 hereof should ever be
adjudicated to exceed the time, geographic, service or other limitations permitted by applicable
law in any jurisdiction, it is the intention of the parties that the provisions shall be amended to
the extent of the maximum time, geographic, service or other limitations permitted by applicable
law, that such amendment shall apply only within the jurisdiction of the court that made such
adjudication and that the provision be enforced to the maximum extent permitted by law.

4.3      Executive irrevocably and unconditionally (i) agrees that any suit, action
or other legal proceeding arising out of Section 2 or 3 hereof, including, without limitation, any
action commenced by the Company for preliminary and permanent injunctive relief and other
equitable relief, may be brought in the United States District Court for the Southern District of
California, or if such court does not have jurisdiction or will not accept jurisdiction, in any court
of general jurisdiction in San Diego County, California; (ii) consents to the non-exclusive
jurisdiction of any such court in any such suit, action or proceeding; and (iii) waives any
objection which Executive may have to the laying of venue of any such suit, action or proceeding
in any such court.  Executive also irrevocably and unconditionally consents to the service of any
process, pleadings, notices or other papers in a manner permitted by the notice provisions of
Section 8 hereof.

4.4      Executive agrees that for a period of five (5) years following the
termination of Executive's employment by the Company, Executive will provide, and that at all
times after the date hereof the Company may similarly provide, a copy of Sections 2 and 3 hereof
to any business or enterprise (i) which Executive may directly or indirectly own, manage,
operate, finance, join, control or participate in the ownership, management, operation, financing
or control of, or (ii) with which Executive may be connected as an officer, director, employee,
partner, principal, agent, representative, consultant or otherwise, or in connection with which
Executive may use or permit Executive's name to be used; provided, however, that this provision
shall not apply in respect of Section 3 hereof after expiration of the time period set forth therein.

5.      Termination.  The Employment Term shall terminate upon the occurrence of any
one of the following events:

5.1      Disability.  The Company may terminate the Employment Term if
Executive is unable substantially to perform Executive's duties and responsibilities hereunder to
the full extent required by the Board by reason of illness, injury or incapacity for six (6)
consecutive months, or for more than six (6) months in the aggregate during any period of twelve
(12) calendar months; provided, however, that the Company shall continue to pay Executive the
Base Salary then in effect for the balance of the then remaining Employment Term determined
without reference to such termination (the "Remaining Employment Term"), but the amount the

Company shall be required to pay Executive shall be reduced by the amount of any disability payments received by Executive pursuant to the Benefit Coverages. In addition, Executive shall be entitled to the following: (i) a pro rata bonus, if any, for the year of termination; (ii) any other amounts earned, accrued or owing but not yet paid under Section 1 above; (iii) the continued right to exercise any vested stock option, if any, for a period of one (1) year following the date of Executive's termination; (iv) continued participation for the Remaining Employment Term in those Benefit Coverages in which Executive was participating on the date of termination which, by their terms, permit a former employee to participate; and (v) any other benefits in accordance with applicable plans and programs of the Company. In such event, the Company shall have no further liability or obligation to Executive for compensation under this Agreement except as otherwise specifically provided in this Agreement. Executive agrees, in the event of a dispute under this Section 5.1, to submit to a physical examination by a licensed physician selected by the Board, provided that Executive's own physician may be present at Executive's request and sole expense.

     5.2    <u>Death</u>. The Employment Term shall terminate in the event of Executive's death. In such event, the Company shall pay to Executive's executors, legal representatives or administrators, as applicable, an amount equal to the installment of Executive's Base Salary set forth in Section 1.4 hereof for the month in which Executive dies and a pro rata share of any annual bonus to which Executive would otherwise be entitled for the year in which such death occurs. In addition, Executive's estate shall be entitled to (i) any other amounts earned, accrued or owing but not yet paid under Section 1 above; (ii) the continued right to exercise any vested stock option for a period of one (1) year following the date of death; and (iii) any other benefits in accordance with applicable plans and programs of the Company. The Company shall have no further liability or obligation under this Agreement to Executive's executors, legal representatives, administrators, heirs or assigns or any other person claiming under or through Executive except as otherwise specifically provided in this Agreement.

     5.3    <u>Cause</u>. The Company may terminate the Employment Term, at any time, for "cause" up... .irty (30) days' written notice, in which event all payments under this Agreement shall cease, except for Base Salary to the extent already accrued. For purposes of this Agreement, Executive's employment may be terminated for "cause" (i) if Executive is convicted of a felony; (ii) any neglect or breach of duty by Executive, or any failure by Executive to perform such duties as may be delegated to Executive from time to time; (iii) any willful breach of duty by Executive in the course of his employment; (iv) any material breach of any provision of this Agreement; or (v) Executive commits theft, larceny, embezzlement, fraud, any acts of dishonesty, illegality, moral turpitude or gross mismanagement as determined in good faith by the Board, whose determination shall be final and binding; provided, however, with respect to items (ii) and (iii), thirty (30) days' written notice must be given by the Company to Executive for the first offense, which Executive shall have the right to cure to the Board's satisfaction. No such advance notice shall be required to terminate for "cause" with respect to the next offense.

FAX NO.                                    P. 11

5.4    Termination Without Cause.

 5.4.1    The Company may remove Executive, at any time prior to the end of the Employment Term, without cause from the position in which Executive is employed hereunder (in which case the Employment Term shall be deemed to have ended) upon not less than sixty (60) days' prior written notice to Executive; provided, however, that in the event that such notice is given, Executive shall be under no obligation to render any additional services to the Company and, subject to the provisions of Section 3 hereof, shall be allowed to seek other employment. Upon any such removal, Executive shall be entitled to receive, as liquidated damages for the failure of the Company to continue to employ Executive, only the amount due to Executive under the Company's then-current severance pay plan for employees. No other payments or benefits shall be due under this Agreement to Executive, except that Executive shall be entitled to receive payments or benefits under the then-existing Benefit Coverages in which Executive is participating in accordance with the respective terms of such Benefit Coverages. Notwithstanding any provision in this Agreement or the Stock Option Agreements to the contrary, if Executive is terminated by the Company without cause during the first twelve (12) months of the Employment Term, twenty five percent (25%) of the CNA Option Shares and Omnigon International Option Shares shall be vested and exercisable in accordance with the terms of the Stock Option Agreements and provided further if the Company terminates Executive without cause after the first twelve (12) months, an additional amount equal to the lesser of one-half (½) of the remaining options to be vested under the then-remaining Employment Term or twelve (12) additional months of vesting shall be vested and exercisable in accordance with the Stock Option Agreements. Upon termination of Executive without cause, the Loan shall be forgiven on a pro rata basis in an amount equal to the outstanding balance of the Loan times a fraction, the numerator of which is the number of full months served by executive under this Agreement and the denominator is eighteen (18), with any additional balance due and payable by Executive in one lump sum of principal and interest one (1) year following such termination without cause.

 5.4.2    Notwithstanding the foregoing, upon such removal in the event that Executive executes a written release, substantially in the form attached hereto as Exhibit "D" (the "Release"), of any and all claims against the Company and all related parties with respect to all matters arising out of Executive's employment by the Company (other than Executive's entitlement under any stock options, employee benefit plan or program sponsored by the Company in which Executive participated and under which Executive has accrued a benefit), and the termination thereof, Executive shall be entitled to receive, in lieu of the payment described in subsection (a) hereof, which Executive agrees to waive, (i) in equal monthly installments, as liquidated damages for the failure of the Company to continue to employ Executive, an amount equal to the amount of Executive's Base Salary for twenty four (24) months if Executive is terminated without cause during the first eighteen (18) months of the Employment Term and twelve (12) months if Executive is terminated without cause after the first eighteen months of the Employment Term, provided that Executive remains in compliance with the provisions of Sections 2 and 3 hereof; (ii) continuation of those Benefit Coverages as in effect at the time of such termination or removal, or to receive cash in lieu of such benefits or premiums, as applicable, where such Benefit Coverages may not be continued (or where such continuation

::ODMA\PCDOCS\SDL\80\\20538\\5                    8

would adversely affect the tax status of the plan pursuant to which the Benefit Coverage is provided) under applicable law or regulation, for the lesser of the Remaining Employment Term or twelve (12) months; (iii) any other amounts earned, accrued or owing but not yet paid under Section 1 above; and (iv) any other benefits in accordance with applicable plans and programs of the Company.

6.    Survivorship.  The respective rights and obligations of the parties hereunder shall survive any termination of the Executive's employment to the extent necessary to the intended preservation of such rights and obligations.

7.    Arbitration; Expenses.  In the event of any dispute under the provisions of this Agreement other than a dispute in which the sole relief is an equitable remedy such as an injunction, the parties shall be required to have the dispute, controversy or claim settled by arbitration in the City of San Diego, California in accordance with the commercial arbitration rules then in effect of the American Arbitration Association.  In addition, you agree to execute and deliver the Company's standard Arbitration Agreement, attached hereto as Exhibit "B" and incorporated herein by this reference.

8.    Notices.  All notices and other communications required or permitted hereunder or necessary or convenient in connection herewith shall be in writing and shall be deemed to have been given when hand delivered or mailed by registered or certified mail as follows (provided that notice of change of address shall be deemed given only when received):

If to the Company to:       Celterra North America, Inc.
                            6350 B Yarrow Drive
                            Carlsbad, CA 92009
                            Attn: Chairman

With a required copy to:     Kenneth D. Polin, Esq.
                            Zevnik Horton Guibord McGovern
                              Palmer & Fognani, L.L.P.
                            101 West Broadway, Suite 1750
                            San Diego, California  92101

If to Executive to:         J. Benjamin Trowbridge
                            90 Alton Road, #2711
                            Miami Beach, Florida 33139

With a required copy to:     John C. Levy, Esq.
                            Parsinen Kaplan Rosberg & Gotlieb P.A.
                            100 South 5th Street, Suite 1100
                            Minneapolis, Minnesota 55402-1298

::ODMA\PCDOCS\SDLI001\DS18\15                    9

23

or to such other names or addresses as the Company or Executive, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section.

9.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

10.    Further Assurances.  Each party to this Agreement shall execute all instruments and documents and take all actions as may be reasonably required to effectuate this Agreement.

11.    Attorneys' Fees.  In the event any litigation, arbitration, mediation or other proceeding ("Proceeding") is initiated by any party(ies) against any other party(ies) to enforce, interpret or otherwise obtain judicial or quasi-judicial relief in connection with this Agreement, the prevailing party(ies) in such Proceeding shall be entitled to recover from the unsuccessful party(ies) (a) all costs, expenses, actual attorneys' and expert witness fees, relating to or arising out of such Proceeding (whether or not such Proceeding proceeds to judgment), and (b) any post-judgment or post-award proceeding, including, without limitation, one to enforce any judgment or award resulting from any such Proceeding.  Any such judgment or award shall contain a specific provision for the recovery of all such subsequently incurred costs, expenses, actual attorneys' and expert witness fees.  The arbitrator(s) or court shall determine who is the prevailing party, whether or not the dispute or controversy proceeds to final judgment.  Company and Executive expressly acknowledge that this Section is not intended to in any way alter the parties' agreement that arbitration shall be the exclusive method of resolving any dispute related to this Agreement or Executive's employment with the Company as set forth in Section 7.  Company and Executive agree that the reference to litigation in this Section is included so that the prevailing party can recover its attorneys' fees and costs if (a) either party files a lawsuit in violation of Section 7 (e.g., fees and costs incurred obtaining a court order compelling arbitration); or (b) a court rules that the arbitration provision in Section 7 is unenforceable for any reason.

12.    Venue and Jurisdiction.  For purposes of determining the venue and jurisdiction of matters related to the resolution of disputes arising under this Agreement, including, without limitation, the arbitration provisions of Section 7 and the attorney's fees provisions of Section 11, this Agreement shall be deemed as made and to be performed in the County of San Diego, California.

13.    Counterparts.  This Agreement may be executed in one or more counterparts, all of which when fully executed and delivered by all parties hereto and taken together shall constitute a single agreement, binding against each of the parties.  To the maximum extent permitted by law or by any applicable governmental authority, any document may be signed and transmitted by facsimile with the same validity as if it were an ink-signed document.

14.    Modification in Writing.  This Agreement may be modified only by a writing executed by the party(ies) to this Agreement against whom enforcement of such modification is sought.

:ODMA\PCDOCS\SDLIB01\UO53\KIS                    10

15. <u>Headings</u>. The headings of the various Sections of this Agreement have been inserted only for convenience and shall not be deemed in any manner to modify or limit any of the provisions of this Agreement or be used in any manner in the interpretation of this Agreement.

16. <u>Prior Understandings</u>. This Agreement contains the entire agreement between the parties to this Agreement with respect to the subject matter of this Agreement, is intended as a final expression of such parties' agreement with respect to such terms as are included in this Agreement, is intended as a complete and exclusive statement of the terms of such agreement, and supersedes all negotiations, stipulations, understandings, agreements, representations and warranties, if any, with respect to such subject matter, which precede or accompany the execution of this Agreement.

17. <u>Interpretation</u>. Whenever the context so requires, all words used in the singular shall be construed to have been used in the plural (and vice versa), each gender shall be construed to include any other genders, and the word "person" shall be construed to include a natural person, a corporation, a firm, a partnership, a joint venture, a trust, an estate or other entity.

18. <u>Partial Invalidity</u>. Each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. If any provision of this Agreement or the application of such provision to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected by such invalidity or unenforceability, unless such provision or such application of such provision is essential to this Agreement.

19. <u>Successors-in-Interest and Assigns</u>. The Company may assign its rights without the written consent of the Executive, so long as the Company or its assignee complies with the other material terms of this Agreement. This Agreement shall be binding upon and shall inure to the benefit of the successors-in-interest and assigns of each party to this Agreement, except that the duties and responsibilities of Executive hereunder are of a personal nature and shall not be assignable or delegable in whole or in part by Executive. Nothing in this Section shall create any rights enforceable by any other persons not a party to this Agreement, unless such rights are expressly granted in this Agreement to other specifically identified persons. The Company's parents, including, without limitation, Omnigon International, subsidiaries and controlled affiliates shall be express third-party beneficiaries of this Agreement.

20. <u>Waiver</u>. No delay or omission in the exercise of any right or remedy shall impair such right or remedy or be construed as a waiver. A consent to or approval of any act shall not be deemed to waive or render unnecessary consent to or approval of any other or subsequent act. Any waiver of a default under this Agreement must be in writing and shall not be a waiver of any other default concerning the same or any other provision of this Agreement.

21.   **Drafting Ambiguities.** Each party to this Agreement has reviewed and revised this Agreement. Each party to this Agreement has had the opportunity to have such party's legal counsel review and revise this Agreement. The rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

22.   **Beneficiaries: References.** Executive shall be entitled, to the extent permitted under any applicable law, to select and change a beneficiary or beneficiaries to receive any compensation or benefit payable hereunder following Executive's death by giving the Company written notice thereof. In the event of Executive's death or a judicial determination of Executive's incompetence, reference in this Agreement to Executive shall be deemed, where appropriate, to refer to Executive's beneficiary, estate or other legal representative.

23.   **Indemnification.** The Company shall indemnify Executive in the performance of Executive's duties to the fullest extent permitted by applicable laws. In addition, the Executive shall be covered by any officer and director liability insurance policy procured by the Company.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Agreement as of the date first above written.

CELTERRA NORTH AMERICA, INC., a
Delaware corporation

By: _____

~~Dirk A. Wray, President~~ *KENNETH M.*
*HAPPEL, CHAIRMAN*

J. BENJAMIN TROWBRIDGE

*[Signature Page to Employment Agreement]*

:\ODMA\PCDOCS\SDLIB01\2053\5\1\5

12

08/15/02    14:33    ACE MESS.___ SVC. → 619 232 6339                NO.074    ₽32
Case 3:02-cv-01647-K-AJB    Document 1    Filed 08/15/02    PageID.29    Page 29 of 41
Aug 09 20 08:36p      ben trowbridge              305 532 6764        P.10

# Exhibit B

08/15/02   14:33   ACE MESS. ● SVC. → 619 232 6339                    NO.074   ₽33
Case 3:02-cv-01647-K-AJB   Document 1   Filed 08/15/02   PageID.30   Page 30 of 41
Aug 09 20 08:36p      ben trowbridge              305 532 6764            p.11

... .. .....   ..............      7608048080      T-915  P.01/02  F-054

# SECURED PROMISSORY NOTE

$450,000

Carlsbad, California
August 4, 2000

FOR VALUE RECEIVED, the undersigned, J. Benjamin Trowbridge (the "Obligor"), with an address at 90 Alton Road #2711, Miami Beach, Florida 33139, hereby promises to pay to the order of Celterra North America, Inc., a Delaware corporation ("Celterra"), and Omnigon International Holdings Ltd., a British Virgin Island international business company ("Omnigon International," and collectively with Celterra, the "Holder"), jointly and severally, or its assigns, at 6350-B Yarrow Drive, Carlsbad, California, 92009, or at such other place as the Holder of this Note may from time to time designate, the principal sum of Four Hundred Fifty Thousand Dollars ($450,000), with interest at the rate of seven percent (7%) per annum from the date of advance. Interest shall be calculated based on a three hundred sixty-five (365) day year, actual days elapsed. All principal and interest due hereunder is payable in lawful money of the United States of America.

This Note is secured by the Obligor's (i) option to purchase two million four hundred thousand (2,400,000) shares of Celterra's Class B non-voting common stock at an exercise price of Fifty Cents ($0.50) per share, (ii) option to purchase one million (1,000,000) shares of Omnigon International, common stock at an exercise price of Sixty Cents ($0.60) per share, and (iii) any shares issued upon exercise of the options described in (i) and (ii) above (the "Collateral"), which is described further in two Stock Option Agreements of even date herewith, by and between the Obligor and Celterra, and Omnigon International, respectively. The Obligor hereby grants the Holder a security interest in the Collateral and any proceeds thereof. In connection with the exercise of the options described in (i) and (ii) above, the Obligor hereby agrees to execute a Stock Pledge Agreement in a form required by the Holder in a form that will perfect the Holder's security interest in the Collateral.

This Note shall be due and payable in full in one installment of principal and accrued interest on the earlier of eighteen (18) months from this date or termination of the Obligor for cause under a certain Employment Agreement between the Obligor and Celterra (the "Employment Agreement") or voluntary resignation as an employee of Celterra. If the Obligor remains employed as a full-time employee by Celterra (or an affiliate by mutual agreement) at the end of eighteen (18) months, this Note shall be cancelled in its entirety. Notwithstanding any provision in this Note, upon termination of the Obligor without cause under the Employment Agreement, this Note shall be forgiven on a pro rata basis in an amount equal to the outstanding balance of this Note times a fraction, the numerator of which is the number of full months served by the Obligor under the Employment Agreement and the denominator is eighteen (18), with any additional balance due and payable by the Obligor in one lump sum of principal and interest one (1) year following such termination without cause.

At the option of the Holder hereof, this Note shall be immediately due and payable, without notice or demand, upon the occurrence at any time upon (i) any sale, offer to sell, transfer or attempt to transfer, the Collateral by the Obligor, or (ii) the commencement of proceedings in bankruptcy, or for the reorganization of the Obligor, or for the readjustment of any of the debts of the Obligor, under the Federal Bankruptcy Code, as amended, or any part thereof, or under any other laws,

28

08/15/02   14:33   ACE MESS. A  SVC. → 619 232 6339          NO.074   034
Case 3:02-cv-01647-K-AJB   Document 1   Filed 08/15/02   PageID.31   Page 31 of 41
Aug 09 20 08:37p   ben trowbridge        305 532 6764        p.12
                                      T608048880      T-815  P.02/02  F-054

whether state or federal, for the relief of debtors, now or hereafter existing, which shall not be discharged within thirty (30) days of their commencement.

If this Note is not paid when due, whether at maturity or by acceleration, the Obligor promises to pay all costs of collection, including, but not limited to, reasonable attorneys' fees and court costs incurred by the Holder hereof on account of such collection, whether or not suit is filed hereon. The Obligor further agrees that all proceeds of the Collateral shall be used to pay all costs of collection.

The Obligor may, at any time and from time to time, without penalty, make prepayments which will be applied to the final payment of principal under this Note, or the principal components of the remaining payments under this Note in the order or inverse order of maturity, all as the Holder hereof may determine.

Presentment, demand and protest, and notices of protest, dishonor, and non-payment of this Note and all notices of every kind, are hereby waived.

No single or partial exercise of any power hereunder shall preclude the other or further exercise thereof or the exercise of any other power. No delay or omission on the part of the Holder hereof in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note.

IN WITNESS WHEREOF, the Obligor has executed and delivered this instrument the day and year first above written.

J. Benjamin Trowbridge

*[Signature Page to Secured Promissory Note ($450,000)]*

2

29

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
## INDEPENDENT CALENDAR CLERK
330 W. Broadway
San Diego, CA 92101

**TO:**

KEITH FINK
FINK & FELDMAN, LLP
11500 OLYMPIC BLVD STE 316
LOS ANGELES, CA  90064

| | |
|---|---|
| CELETERRA NORTH AMERICA INC **Plaintiff(s)** | Case No.: GIC789895 |
| vs. | **NOTICE OF CASE ASSIGNMENT** |
| J BENJAMIN TROWBRIDGE **Defendant(s)** | Judge: WILLIAM R. NEVITT, JR. |
| | Department: 64 |
| | Phone: 619-685-6031 |
| | This case **IS NOT** eligible to participate in a pilot mediation program. |

**COMPLAINT FILED** 06/05/02

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SUPCT CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document. (Rule 5.6)

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.) (Rule 5.7)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service. (Rule 5.8)

**CASE MANAGEMENT CONFERENCE:** A Case Management Conference will be set within 150 days of filing the complaint.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN MEDIATION OR ARBITRATION PURSUANT TO CCP 1730 OR 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO MEDIATION UNDER THE MEDIATION PILOT PROGRAM, OR TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SUPCT CIV-357 OR 358 PRIOR TO THAT HEARING.

ALSO SEE THE ATTACHED NOTICE TO LITIGANTS.

## CERTIFICATE OF SERVICE

I, STEPHEN THUNBERG, certify that: I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown below by placing a true copy in a separate envelope, addressed as shown; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at  SAN DIEGO , California.

Dated:  06/11/02                          STEPHEN THUNBERG              Clerk of the Superior Court
                                            by Cindy Reed, Deputy Clerk

SDSC CIV-721(Rev 3-00)              ASB-NOTICE OF CASE ASSIGNMENT

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
## INDEPENDENT CALENDAR CLERK
330 W. Broadway
San Diego, CA 92101

TO:

STACY A COLEMAN
KEITH A FINK & ASSOCIATES
11500 OLYMPIC BLVD., SUITE 316
LOS ANGELES, CA  90064

| | |
|---|---|
| CELETERRA NORTH AMERICA INC<br>Plaintiff(s)<br><br>vs.<br><br>J BENJAMIN TROWBRIDGE<br>Defendant(s) | Case No.:  GIC789895<br><br>**NOTICE OF CASE ASSIGNMENT**<br><br>Judge:  WILLIAM R. NEVITT, JR.<br>Department:  64<br>Phone:  619-685-6031<br>This case **IS NOT** eligible to participate in a pilot mediation program. |

**COMPLAINT FILED** 06/05/02

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SUPCT CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document. (Rule 5.6)

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.) (Rule 5.7)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service. (Rule 5.8)

**CASE MANAGEMENT CONFERENCE:** A Case Management Conference will be set within 150 days of filing the complaint.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN MEDIATION OR ARBITRATION PURSUANT TO CCP 1730 OR 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO MEDIATION UNDER THE MEDIATION PILOT PROGRAM, OR TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SUPCT CIV-357 OR 358 PRIOR TO THAT HEARING.

ALSO SEE THE ATTACHED NOTICE TO LITIGANTS.

### CERTIFICATE OF SERVICE
I, STEPHEN THUNBERG, certify that: I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by placing a true copy in a separate envelope, addressed as shown; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at SAN DIEGO, California.

Dated:  06/11/02                         STEPHEN THUNBERG _____  Clerk of the Superior Court
                                  by Cindy Reed, Deputy Clerk

SDSC CIV-721(Rev 3-00)              ASG-NOTICE OF CASE ASSIGNMENT

P.3                 3056723878            Maxine Morgan

08/15/02    14:33    ACE MESS.    SVC. → 619 232 6339                                    NO.074    037
FROM MORGAN LEWIS PHILADELPHIA NEC-9-5          (WED) 7.24'02 15:17/ST. 15:13/NO. 4860405755 P  6

## NOTICE TO LITIGANTS

You are required to serve a copy of the following documents with the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 5.6:

- A copy of this Notice to Litigants; and
- A copy of the Notice of Case Assignment.

Filing the Certificate of Service will signify that this information has been served on all defendants.

---

### SAN DIEGO SUPERIOR COURT MEDIATION PILOT PROGRAM
(Effective for cases filed on or after February 28, 2000)

This case has been assigned to a department that is NOT PARTICIPATING in the mediation pilot program and has been designated "not eligible" for mediation. Accordingly, your case CANNOT BE ORDERED TO THE COURT REFERRED MEDIATION PROGRAM. However, we are providing the following information to explain the new program in the event you have other cases that fall within its scope and to clarify your available alternative dispute resolution options

**Program Overview:** The San Diego Superior Court has been selected by the Judicial Council to participate in a pilot program for the early mediation of civil cases (referred to as the "mediation pilot program") established by Code of Civil Procedure section 1730 et seq. and the California Rules of Court rules 1640 et seq. The former court-ordered mediation program (established by CCP 1775 et seq. and applicable to all cases filed on or before **February 27, 2000**) shall end upon completion of mediation of all cases under that program. No case filed after that date may be ordered to the old mediation program.

In addition, no case filed on or after **February 28, 2000** and assigned to a non-participating department at the time of filing may be ordered to mediation under the new mediation pilot program. The department to which this matter has been assigned is a non-participating department. Accordingly, this matter cannot be ordered to the new mediation pilot program.

The new mediation pilot program is designed to assess the benefits of early mediation and authorizes the court to 1) schedule early Case Management Conferences (ECMC), 2) order cases to mediation, and 3) allow parties to stipulate to early mediation in advance of the ECMC. San Diego Superior Court Rule 2.31 addresses the program specifically.

**Available Alternatives to Litigation:** For more information about Civil Alternative Dispute Resolution, please refer to the court's web site at http://www.sandiego.courts.ca.gov/superior .

**Voluntary Mediation:** Because your case has been assigned to a department that is not participating in the mediation pilot program and designated "non-eligible", your case will not be ordered to mediation by the court. However, you may stipulate to voluntary mediation outside the court system. If you choose to do so, mediator fees must be paid by the litigants and will not be paid by court. The existing option of private mediation is unaffected by the new mediation pilot program.

**Judicial Arbitration:** No changes in arbitration procedures have been made. The judicial arbitration program remains available to all cases in San Diego County. Please refer to Superior Court Rules 2.24 and 2.25.

Voluntary mediation and other alternative dispute resolution services are available in San Diego County, including Dispute Resolution Programs Act (DRPA) funded programs. For a listing of DRPA funded community mediation programs, please contact the County's DRPA Program Office at (619) 338-2797. To stipulate to Alternative Dispute Resolution options outside the court system, please complete CIV-359 Stipulation to Use of Private Alternative Dispute Resolution Process.

**Program Evaluation:** The Judicial Council has requested that the court collect information from civil litigants and their attorneys about what methods they used to try to resolve their case, how long it took to resolve the case, the costs associated with resolving the case, and how satisfied they were with the process(es) used to try to reach resolution. In order to obtain this information, the court will be sending written surveys to parties in some civil cases, including those cases not included in the pilot mediation program. Researchers working on the program may also be contacting parties in some civil cases to conduct brief telephone interviews. The court appreciates your cooperation in this information collection effort. The time you spend providing us with information about your experience will help both this court and other courts throughout California in providing high quality appropriate dispute resolution services to civil litigants.

Thank you for your cooperation and assistance in this matter.
SDSC CIV-731 (Rev. 12-01)

982.2(b)(1)

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Stacy A. Coleman, Bar NO. 217240<br>Keith A. Fink & Associates<br>11500 Olympic Blvd., Suite 316<br><br>Los Angeles, CA 90064<br>TELEPHONE NO: 310-268-0780   FAX NO: 310-268-0790 | |

ATTORNEY FOR (Name): Celterra North America, Inc.

INSERT NAME OF COURT, JUDICIAL DISTRICT, AND BRANCH COURT, IF ANY:
San Diego Superior Court
Central Division

CASE NAME: Celterra v. Trowbridge

| CIVIL CASE COVER SHEET<br>☐ Limited  ☒ Unlimited | Complex Case Designation<br>☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 1811) | CASE NUMBER:<br>ASSIGNED JUDGE:  789895 |
|---|---|---|

Please complete all five (5) items below.

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (e.g., discrimination, false arrest) (08)
- ☐ Defamation (e.g., slander, libel) (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (e.g., legal malpractice) (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☒ Breach of contract/warranty (06)
- ☐ Collections (e.g., money owed, open book accounts) (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (e.g., quiet title) (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)

- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Claims involving mass tort (40)
- ☐ Securities litigation (28)
- ☐ Toxic tort/Environmental (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (e.g., sister state, foreign, out-of-county abstracts) (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition (not specified above) (43)

2. This case ☒ is  ☐ is not   complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination and related actions pending in one or more courts in other counties, states or countries, or in a federal court
   f. ☐ Substantial post-disposition judicial disposition

3. Type of remedies sought (check all that apply):
   a. ☒ monetary  b. ☐ nonmonetary; declaratory or injunctive relief  c. ☐ punitive

4. Number of causes of action (specify): three

5. This case ☒ is  ☐ is not   a class action suit.

Date: June 4, 2002

Stacy A. Coleman, Bar No. 217240
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 982.2.)
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

Form Adopted for Mandatory Use
Judicial Council of California
982.2(b)(1) [Rev. January 1, 2000]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 982.2, 1800–1812;
Standards of Judicial Administration, § 19

1  Linda Van Winkle Deacon (State Bar No. 60133)
   Susan C. V. Jones (State Bar No. 149446)
2  BATE, PETERSON, DEACON, ZINN & YOUNG, LLP
   888 South Figueroa Street
3  15th Floor
   Los Angeles, California 90017
4  Telephone:    (213) 362-1860
   Facsimile:    (213) 362-1861
5
   Attorneys for Defendant
6  J. BENJAMIN TROWBRIDGE

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                              COUNTY OF SAN DIEGO

10

11
   CELTERRA NORTH AMERICA, INC., a )      Case No.  GIC 789895
12 Delaware Corporation,             )
                                     )
13            Plaintiff,             )      **NOTICE TO ADVERSE PARTY OF**
                                     )      **REMOVAL OF CIVIL ACTION TO THE**
14       v.                          )      **UNITED STATES DISTRICT COURT**
                                     )      **FOR THE SOUTHERN DISTRICT OF**
15 J. BENJAMIN TROWBRIDGE, an        )      **CALIFORNIA**
   individual; and DOES 1 through 10, )
16                                   )
                                     )      Action commenced: June 5, 2002
17            Defendants.            )
                                     )
18 _____)

19

20

21

22

23 TO PLAINTIFF CELTERRA NORTH AMERICA, INC. AND TO ITS ATTORNEYS OF

24 RECORD:

25        PLEASE TAKE NOTICE THAT a Notice of Removal of this action was filed in the

26 United States District Court for the Southern District of California, on August 15, 2002. A copy

27                                          1

28 _____
            NOTICE TO ADVERSE PARTY OF REMOVAL OF CIVIL ACTION
                   TO THE UNITED STATES DISTRICT COURT

1   of the Notice of Removal, which effects removal of this action to the United States District

2   Court, is attached hereto.

3

4   DATED: August 14, 2002              BATE, PETERSON, DEACON, ZINN & YOUNG LLP

5

6                                      By: _____
                                           Susan C. V. Jones
7                                          Attorneys for Defendant
8                                          J. BENJAMIN TROWBRIDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                            2

28   ─────────────────────────────────────────────────────
              NOTICE TO ADVERSE PARTY OF REMOVAL OF CIVIL ACTION
                     TO THE UNITED STATES DISTRICT COURT

1   Linda Van Winkle Deacon (State Bar No. 60133)
Susan C. V. Jones (State Bar No. 149446)
2   BATE, PETERSON, DEACON, ZINN & YOUNG, LLP
888 South Figueroa Street
3   15th Floor
Los Angeles, California 90017
4   Telephone:   (213) 362-1860
Facsimile:   (213) 362-1861
5
Attorneys for Defendant
6   J. BENJAMIN TROWBRIDGE

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SAN DIEGO

10

11

12   CELTERRA NORTH AMERICA, INC., a )   Case No. GIC 789895
Delaware Corporation,           )
13                       )
Plaintiff,        )   **COPY OF NOTICE OF REMOVAL, THE**
14                      )   **ORIGINAL OF WHICH WAS FILED**
v.              )   **WITH THE UNITED STATES DISTRICT**
15                      )   **COURT FOR THE SOUTHERN**
J. BENJAMIN TROWBRIDGE, an   )   **DISTRICT OF CALIFORNIA**
individual; and DOES 1 through 10,  )
16                      )
                     )   Action commenced: June 5, 2002
17         Defendants.     )
                     )
18

19

20

21

22

23   TO THE CLERK OF THE SAN DIEGO COUNTY SUPERIOR COURT:

24          PLEASE TAKE NOTICE THAT a Notice of Removal of this action was filed in the

25   United States District Court for the Southern District of California, on August 15, 2002.

26   Attached hereto is a copy of the Notice of Removal, the original of which was filed with the

27                         1

28              **COPY OF NOTICE OF REMOVAL OF CIVIL ACTION**
             **TO THE UNITED STATES DISTRICT COURT**

08/15/02    14:33    ACE MESS.ATT.SOC. → 619 232 8339                    NO. 074    002

**CIVIL COVER SHEET**

VIA FAX

JS44
(Rev. 07/89)

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

02 AUG 15 PM 3:33

**I (a) PLAINTIFFS**
CELTERRA NORTH AMERICA, INC., a
Delaware corporation

**DEFENDANTS** J. BENJAMIN TROWBRIDGE, an individual;
and DOES 1 through 10

'02 CV 1647 K (AJB)

BY:

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** San Diego
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** Dade County, FL
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Keith A. Fink/Stacy A. Coleman
Keith A. Fink & Associates
11500 Olympic Blvd., Ste. 316
Los Angeles, CA 90066 (213)268-0780

**ATTORNEYS (IF KNOWN)** LINDA V.W. DEACON/SUSAN C.V. JONES
Bate, Peterson, Deacon, Zinn & Young, LLP
888 S. Figueroa Street, 15th Floor
Los Angeles, CA 90017
    (213) 362-1860

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question
   (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☒2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)
Claims on First Amended Complaint for (1) Breach of Contract (Employment Agreement; and (2) Breach of Promissory Note. Removed because of diversity. 28 U.S.C. Sections 1332 and 1441.

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

☐ 1 Original Proceeding  ☒ 2 Removal from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23
**DEMAND $** 150,000.00 plus attorney fees and interest
JURY DEMAND: ☒ YES ☐ NO

Check YES only if demanded in complaint:

**VIII. RELATED CASE(S) IF ANY** (See Instructions)    JUDGE N/A    Docket Number:

DATE August 15, 2002

SIGNATURE OF ATTORNEY OF RECORD    *Susan C.V. Jones*
                                    SUSAN C.V. JONES

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

PD $150.00  8/15/02 #86684 KB